Counsel of Record:
Scott A. Thompson
Christopher R. Kelly
Paul T. Chryssikos
Securities and Exchange Commission
Philadelphia Regional Office
One Penn Center
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone: 215-597-3100
Facsimile: 215-597-2740

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>JAY Y. FUNG,<br><br>    Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission"), One Penn Center, 1617 JFK Blvd., Suite 520, Philadelphia, Pennsylvania 19103, alleges as follows against defendant Jay Y. Fung ("Fung"), whose last known address is 604 Enfield Court, Delray Beach, Florida 33444:

### SUMMARY

1. In November 2011, Fung engaged in insider trading by purchasing Pharmasset, Inc. ("Pharmasset") securities based on an illegal tip he received from Kevin Dowd ("Dowd"), a friend and former business associate, consisting of material nonpublic information regarding the impending public announcement that Gilead Sciences, Inc. ("Gilead") would acquire Pharmasset.

2. As of November 2011, Fung had for many years been friends with Dowd, a securities industry professional employed by the Aventura, Florida branch office of a registered broker-dealer with branch offices throughout the United States ("Brokerage Firm").

3. During the course of his duties and responsibilities at Brokerage Firm in the fall of 2011, Dowd obtained information that Pharmasset was negotiating a sale of the company at a premium price above its then-current trading price. Dowd knew that the source of this information was a customer of his branch office of Brokerage Firm who was a member of Pharmasset's board of directors ("Pharmasset Director").

4. On Friday, November 18, 2011, Dowd learned additional information regarding the sale of Pharmasset during the course of his duties and responsibilities at Brokerage Firm. Specifically, Dowd learned that a public announcement regarding the acquisition of Pharmasset was imminent. Dowd knew that the source of this information was the Pharmasset Director.

5. That day, in breach of a duty he owed to Brokerage Firm, Dowd passed along, or "tipped," material nonpublic information regarding the impending sale of Pharmasset to Fung.

6. After speaking to Dowd on November 18, 2011, Fung purchased 2,700 shares of Pharmasset stock in a brokerage account that he owned and controlled. Fung also directed a friend and business partner ("Business Partner") to purchase 100 Pharmasset call options in a second brokerage account that Fung co-owned and controlled.

7. On Monday, November 21, 2011, the next trading day after Fung's purchases of Pharmasset securities, Gilead and Pharmasset publicly announced the acquisition. As a result, the price of Pharmasset stock rose to $134.14 -- an increase of $61.47, or 84.6% -- from its closing price on Friday, November 18, 2011, the previous trading day.

8. Within hours of the public announcement of the sale of Pharmasset on November 21, 2011, Fung liquidated his Pharmasset stock and options, reaping a total of approximately $708,328 in illegal profits.

9. In exchange for the profitable tip, Fung provided Dowd with $35,000 in the form of a cashier's check. Fung later provided Dowd with an additional approximately $30,000 in cash.

10. By knowingly or recklessly engaging in the conduct described in this Complaint, Fung violated, and unless enjoined will continue to violate, Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5 & 240.14e-3].

## JURISDICTION AND VENUE

11. The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement and prejudgment interest, and such other and further relief as the Court may deem just and appropriate.

12. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].

13. Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of New Jersey, and were effected, directly or indirectly, by making use of the means or instruments or instrumentalities of transportation or communication in interstate commerce, or of the mails, or the facilities of a national securities exchange.

## DEFENDANT

14. **Fung**, age 40, resides in Delray Beach, Florida. During the fall of 2011, Fung was involved with one or more business entities engaged in marketing and promoting securities including penny stocks. As of November 2011, Fung had been friends with Dowd for many years. Fung and Dowd formerly worked together at a company involved in the promotion of securities including penny stocks.

## RELATED PERSONS AND ENTITIES

15. **Pharmasset**, before its acquisition by Gilead, was a publicly-traded clinical-stage pharmaceutical company based in Princeton, New Jersey, with a focus on the development of oral therapeutics for the treatment of the hepatitis C virus. Before it was acquired, Pharmasset's stock was traded on the Nasdaq Stock Market under the ticker symbol "VRUS."

16. **Dowd**, age 40, resides in Boca Raton, Florida. From 2005 through approximately October 2012, Dowd worked as a registered representative in a branch office of Brokerage Firm in Aventura, Florida. As of the fall of 2011, Dowd had been friends with Fung for many years.

17. **Business Partner**, age 41, resides in Boca Raton, Florida. As of the fall of 2011, Business Partner and Fung had been friends for many years. Business Partner and Fung had also formerly worked together in one or more companies engaged in the promotion of securities including penny stocks. In approximately August 2011, Business Partner began a new business relationship with Fung pursuant to which he opened a securities brokerage account with money provided by Fung and a Fung associate ("Fung Associate") and began trading securities on his own as well as their behalf.

18. **Pharmasset Director**, age 71, resides in Miami, Florida. Prior to Pharmasset's acquisition by Gilead, Director was a member of Pharmasset's board of directors. As of

November 2011, he was one of the largest customers of the Aventura, Florida branch office of Brokerage Firm where Dowd worked.

19.     **Brokerage Firm** is a New York-based broker-dealer and investment adviser registered with the Commission with branch offices throughout the United States including one in Aventura, Florida, where Dowd worked.

## FACTS

### Dowd's Role at Brokerage Firm

20.     From 2005 through approximately late October 2012, Dowd worked as a financial adviser at the Aventura, Florida branch office of Brokerage Firm. The branch office where Dowd worked specialized in providing investment, wealth management, estate planning, insurance-related, and other services to corporate executives, directors, business owners and high net-worth individuals and families. At Brokerage Firm, Dowd had responsibility for, among other things, entering securities trades for customers and handling customer-related insurance matters.

21.     Dowd owed his employer, Brokerage Firm, a fiduciary duty, or a similar duty arising from acceptance of a duty of confidentiality or from a relationship of trust and confidence, to keep the information of Brokerage Firm and its customers confidential and to refrain from tipping others material nonpublic information that he obtained through his employment. Dowd knew and understood that he owed Brokerage Firm this duty.

22.     Brokerage Firm's policies and procedures mandated: "[y]ou may never, under any circumstances, trade, encourage others to trade, or recommend securities, derivatives or other financial instruments while in the possession of material non-public information." The policies and procedures also specifically listed information relating to proposed or agreed mergers and

acquisitions as examples of material nonpublic information. Brokerage Firm's policies and procedures further mandated that: "[y]ou must protect confidential information, regardless of its form or format, from the time of its creation or receipt until its authorized disposal," and specifically listed "acquisition or divestiture plans" as an example of confidential information.

### Fung's Brokerage Accounts

23. In the fall of 2011, Fung had at least two brokerage accounts, neither of which was at Brokerage Firm. One of these accounts ("Fung Account 1") was in the name of an entity that Fung controlled and was maintained with a registered broker-dealer headquartered in Shrewsbury, New Jersey. Fung's other brokerage account ("Fung Account 2") was in the name of a different entity and was maintained at a different registered broker-dealer headquartered in Glenview, Illinois. Fung co-owned Fung Account 2 with Business Partner and the Fung Associate and exercised control over the account.

24. As of 2011, Fung and Business Partner had been friends for many years. They had also previously worked together at one or more companies engaged in marketing and promoting securities including penny stocks. Separate from his work with Fung, Business Partner also had experience as a securities trader and had formerly worked as a registered representative at one or more registered broker-dealers.

25. In or around the summer of 2011, Business Partner was unemployed. Fung approached Business Partner and proposed that Business Partner open a securities brokerage account with money provided by Fung and the Fung Associate to trade securities with the understanding that they would all jointly own the account and share any profits generated by Business Partner's trading. Business Partner accepted Fung's proposal. Thereafter, in approximately August 2011, with $100,000 provided by Fung, and another $100,000 provided

by the Fung Associate, Business Partner opened Fung Account 2 and began trading securities in the account.

26.  Business Partner and Fung had an unwritten agreement that they and the Fung Associate jointly owned the account, as well as any trading profits. However, at all relevant times, Fung had control over the assets in the account and, from time to time, directed Business Partner to trade specific securities in the account.

## The Sale of Pharmasset

27.  On September 2, 2011, Gilead made an initial offer to acquire Pharmasset for $100 per share in cash. Following Gilead's initial offer, the parties engaged in discussions relating to a possible sale and, on October 7, 2011, Gilead increased its offer to acquire Pharmasset to $125 per share.

28.  During a meeting of Pharmasset's board of directors on October 11, 2011, the board determined that the company should contact other potential buyers and conduct an auction process, or "market check," designed to lead to a sale of the company at the most favorable price.

29.  Starting on October 12, 2011, Pharmasset's investment bankers contacted several other pharmaceutical companies to inquire as to whether they would be interested in exploring a possible acquisition of Pharmasset by participating in the auction process.

30.  In response to the inquiries of Pharmasset's investment bankers, several pharmaceutical companies, in addition to Gilead, expressed an interest in a possible acquisition of Pharmasset. The companies participating in the auction process conducted due diligence during October and November 2011.

31. In connection with the auction process, Pharmasset and its investment banking firm set November 17, 2011 as the "bid date," or deadline, for prospective buyers to submit offers to acquire Pharmasset.

32. By November 17, 2011, all potential buyers participating in the auction process, other than Gilead, had informed Pharmasset that they were no longer interested in pursuing an acquisition. That day, Gilead increased its offer to acquire Pharmasset to $135 per share.

33. On Friday, November 18, 2011, Pharmasset's board of directors, along with certain executives based in the company's Princeton, New Jersey headquarters and the company's financial and legal advisers, convened telephonically to consider Gilead's increased offer to acquire the company for $135 per share.

34. While in New Jersey, the Pharmasset Director participated in the Pharmasset board meeting telephonically. The Pharmasset Director also communicated from New Jersey on that day via telephone with one or more of his advisers in the Aventura, Florida branch office of Brokerage Firm.

35. Over the weekend of November 19, 2011 and November 20, 2011, Pharmasset's management informed Gilead's management that Pharmasset would agree to an acquisition at a purchase price of $137 per share. After additional negotiations, Gilead agreed.

36. At approximately 7:00 a.m. on Monday, November 21, 2011, Gilead and Pharmasset issued a press release announcing their agreement and the forthcoming commencement of a cash tender offer to acquire all outstanding shares of Pharmasset for $137 per share. That price reflected a premium of approximately 89% over the trading price of Pharmasset stock on the previous trading day. In response to this announcement, the price of

Pharmasset stock rose $61.47, or 84.6%, to close at $134.14 on November 21, 2011, up from its $72.67 closing price on Friday, November 18, 2011.

### Dowd Obtained Material Nonpublic Information Regarding the Sale of Pharmasset

37. As of the fall of 2011, the Pharmasset Director was a longtime customer of Brokerage Firm and for years had used the Aventura, Florida branch office to advise and assist him with respect to many aspects of his finances, including investments, tax and estate planning, insurance matters, and the holdings of Pharmasset securities that he had accumulated as a result of his board service.

38. Prior to November 18, 2011, the Pharmasset Director informed one or more of his financial advisers at Dowd's branch office of Brokerage Firm, in confidence and as part of his receiving professional financial advice, that Pharmasset was involved in an auction process to sell the company at a premium price, had attracted the interest of several large pharmaceutical companies, and was going to be sold.

39. As a result of his duties and responsibilities at Brokerage Firm, Dowd became aware that Pharmasset was negotiating a sale of the company at a premium price while that information was still nonpublic.

40. At a morning meeting, Dowd and several of his co-workers at Brokerage Firm discussed the likely sale of Pharmasset. During this meeting, in light of the receipt of material nonpublic information regarding Pharmasset by their branch office, one of Dowd's supervisors stressed that all employees in their office were restricted from recommending or trading Pharmasset securities, including in their customers' accounts and in their personal brokerage accounts. One of Dowd's supervisors also specifically instructed Dowd to cancel any orders that their branch office had pending for Pharmasset securities.

41. On Friday, November 18, 2011, Dowd learned additional information regarding the sale of Pharmasset during the course of his duties and responsibilities at Brokerage Firm. Specifically, Dowd learned that a public announcement regarding the acquisition of Pharmasset at a premium price was imminent. Dowd knew that the source of the information was the Pharmasset Director.

### Dowd Provided Fung with Material Nonpublic Information Regarding the Sale of Pharmasset

42. On Friday, November 18, 2011, Dowd supplied Fung with material nonpublic information regarding the sale of Pharmasset.

43. During one or more telephone calls on Friday, November 18, 2011, Dowd informed Fung that Pharmasset's board of directors had accepted an offer to acquire the company and that Pharmasset was going to be bought at a higher price than its then-current trading price. Dowd also told Fung that the source of the information was a customer of Dowd's branch office of Brokerage Firm who was a member of Pharmasset's board of directors. In at least one of the calls he had with Fung on November 18, 2011, Dowd told Fung that, if he had not yet purchased any Pharmasset securities, he needed to buy some.

### On November 18, 2011, Fung Purchased Pharmasset Stock in Fung Account 1 Based on Material Nonpublic Information Provided by Dowd

44. On November 18, 2011, after speaking with Dowd and obtaining material nonpublic information regarding the sale of Pharmasset, Fung wired $196,000 into Fung Account 1. Prior to this wire transfer, this brokerage account had a zero balance and had not been used for any transactions for over three months.

45. Thereafter, at approximately 1:29 p.m. on November 18, 2011 -- around the same time as his last call with Dowd that day -- Fung purchased 2,700 shares of Pharmasset stock at

10

approximately $71.89 per share in Fung Account 1. Fung's brokerage firm entered this trade on his behalf from its Shrewsbury, New Jersey headquarters. Fung's purchase of 2,700 shares of Pharmasset stock cost a total of $195,808, nearly the entire $196,000 wired into his brokerage account that same day.

46.  Fung's November 18, 2011 purchase of 2,700 shares of Pharmasset stock in Fung Account 1 was made while he was in possession of, and on the basis of, material nonpublic information regarding the sale of Pharmasset provided to him by Dowd.

### Fung Also Directed Business Partner to Purchase Pharmasset Call Options in Fung Account 2

47.  Also on Friday, November 18, 2011, based on the material nonpublic information regarding the sale of Pharmasset provided to him by Dowd, Fung directed Business Partner to purchase Pharmasset call options in Fung Account 2.

48.  Between approximately 11:29 a.m. and 12:29 p.m. on Friday, November 18, 2011, Fung and Business Partner had four telephone calls. During one or more of these telephone calls, Fung directed Business Partner to purchase Pharmasset call options in Fung Account 2.

49.  Between approximately 1:25 p.m. and approximately 1:28 p.m. on Friday, November 18, 2011, Fung and Business Partner also exchanged multiple text messages.

50.  One of the text messages that Fung sent to Business Partner on Friday, November 18, 2011 stated: "Buy VRUS." This referred to Pharmasset's ticker symbol, which was VRUS. This text message was immediately followed by another text message stating: "Today."

51.  At approximately 1:32 p.m., Business Partner began to purchase out-of-the-money Pharmasset call options in Fung Account 2. The purchases of call options in Fung

Account 2 took place about three minutes after the purchase of 2,700 shares of Pharmasset stock in Fung Account 1.

52. An option gives the purchaser the option to buy or sell 100 shares of the underlying stock. A "call option" gives the purchaser the right, but not the obligation, to purchase a security at a specified price, the "strike price," within a specific time period. A buyer of a call option anticipates that the price of the underlying security will increase. An "out-of-the-money" call option has a strike price that is higher than the current market price of the underlying stock and has no value at expiration unless the price of the underlying stock has risen higher than the strike price as of the expiration date.

53. At Fung's direction, between approximately 1:32 p.m. and 1:35 p.m. on Friday, November 18, 2011, Business Partner purchased 50 December 2011 call options with a strike price of $75 at an average price of $3.10 and 50 December 2011 call options with a strike price of $80 at an average price of $1.66 in Fung Account 2.

54. Fung's November 18, 2011 purchase of 100 Pharmasset call options in Fung Account 2, via Business Partner, was made while he was in possession of, and on the basis of, material nonpublic information regarding the sale of Pharmasset provided to him by Dowd.

### After the Acquisition Announcement, Fung Sold His Pharmasset Securities, Realizing Illegal Profits Of $708,328

55. At approximately 10:23 a.m. on Monday, November 21, 2011, within only a few hours of the 7:00 a.m. public announcement that Gilead would acquire Pharmasset, Fung sold all 2,700 shares of Pharmasset stock he had purchased the previous Friday for $134.16 per share in Fung Account 1. Fung's brokerage firm entered this trade on his behalf from its Shrewsbury, New Jersey headquarters. Upon this sale, Fung realized $163,621 in illegal profits in Fung Account 1.

56. Also on Monday, November 21, 2011, between approximately 10:44 a.m. and 11:04 a.m., Fung directed Business Partner to sell all of the Pharmasset call options he had purchased in Fung Account 2 the previous Friday. All 50 December 2011 $80 call options were sold at an average price of $54.39, and all 50 December 2011 $75 call options were sold at an average price of $59.33. As a result of these trades, Fung realized illegal profits of $544,706 in Fung Account 2.

57. In a span of two trading days, Fung realized a total of $708,328 in illegal profits by purchasing Pharmasset securities in two different brokerage accounts based on material nonpublic information regarding the sale of Pharmasset supplied by Dowd.

### Fung Provided Dowd with Cash Kickbacks

58. In approximately December 2011, Fung went to Dowd's house in Boca Raton, Florida, and told Dowd that he and Business Partner had purchased Pharmasset stock and options and made significant profits based on the information that Dowd provided to him. Thereafter, Fung gave Dowd thirty-five thousand dollars ($35,000) in the form of a cashier's check made payable to Dowd and dated January 2, 2012. The $35,000 cashier's check was deposited into Dowd's bank account two days later, on January 5, 2012. Dowd understood this payment from Fung to be a "thank you" for providing Fung with nonpublic information relating to Pharmasset's acquisition.

59. Thereafter, Fung provided Dowd with an additional approximately thirty thousand dollars ($30,000) in cash in two installments. The first installment consisted of approximately twenty-five thousand dollars ($25,000) and was delivered to Dowd by an intermediary on Fung's behalf in a FedEx envelope. When making the delivery, the intermediary communicated to Dowd that the delivery was from Fung. The second installment consisted of approximately five

thousand dollars ($5,000), and was personally delivered by Fung to Dowd. Thereafter, Fung offered to provide Dowd with even more money, but Dowd declined Fung's offer.

### Fung Violated the Federal Securities Laws

60. The information regarding the sale of Pharmasset that Dowd provided to Fung was material and nonpublic. A reasonable investor would have viewed that information as important to his or her investment decisions. Fung knew or was reckless in not knowing that the information he received from Dowd relating to the sale of Pharmasset was from a customer of Dowd's branch office of Brokerage Firm who was a member of Pharmasset's board of directors.

61. Fung knew or should have known that Dowd supplied him with material nonpublic information regarding the sale of Pharmasset in breach of a fiduciary or other duty of trust or confidence and for a personal benefit, and Fung assumed a duty to maintain the confidentiality of the information that he received from Dowd.

62. Fung knowingly or recklessly breached his assumed duty by trading on the basis of material nonpublic information regarding the sale of Pharmasset that Dowd provided to him.

63. At the time of each illegal trade identified in this Complaint, Fung traded on the basis of material nonpublic information.

64. Fung provided Dowd with a benefit in exchange for receiving material nonpublic information regarding the sale of Pharmasset from him.

65. At all times relevant to this Complaint, Fung acted knowingly and/or recklessly.

### Fung Traded Pharmasset Securities in Connection with a Tender Offer

66. By November 18, 2011, when Fung purchased Pharmasset securities based on material nonpublic information illegally supplied by Dowd, one or more substantial steps had been taken to commence the tender offer for Pharmasset securities.

67. When Fung traded Pharmasset securities, he was in possession of material nonpublic information relating to the tender offer for Pharmasset securities and he knew or should have known that the information was nonpublic and had been acquired, directly or indirectly, from the target company and/or its advisers or representatives.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

68. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 67, inclusive, as if they were fully set forth herein.

69. By engaging in the conduct described above, in or around November 2011, Fung knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

(a) employed devices, schemes or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

70. By engaging in the foregoing conduct, Fung violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF

### Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder

71. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 70, inclusive, as if they were fully set forth herein.

72. By engaging in the conduct described above, in connection with a tender offer, Fung knowingly or recklessly, engaged in one or more fraudulent, deceptive or manipulative acts.

73. By reason of the foregoing, Fung violated, and unless enjoined will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a final judgment:

### I.

Permanently restraining and enjoining Fung from, directly or indirectly, violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3];

### II.

Ordering Fung to disgorge his unlawful trading profits derived from his activities set forth in this Complaint, together with prejudgment interest thereon; and

## III.

Granting such other and further relief as this Court may deem just, equitable, and necessary.

Respectfully submitted,

BY: *Christopher R. Kelly* (signature)
Scott A. Thompson
Christopher R. Kelly
Paul T. Chryssikos
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
One Penn Center
1617 JFK Blvd., Suite 520
Philadelphia, PA  19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Of Counsel:

Joseph G. Sansone
G. Jeffrey Boujoukos
David L. Axelrod

## Certification

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is the subject of a criminal action pending in this court, No: 16-cr-107 (AET). The United States is the plaintiff in that matter, and Jay Y. Fung is the defendant in that case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 9, 2016, in Philadelphia, Pennsylvania.

BY: *Christopher R. Kelly*
Christopher R. Kelly
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
One Penn Center
1617 JFK Blvd., Suite 520
Philadelphia, PA  19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>   Plaintiff,<br><br> v.<br><br>JAY Y. FUNG,<br><br>   Defendant. | Case No.<br><br>**DESIGNATION OF AGENT FOR SERVICE** |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in this action. Therefore, service upon the United States or its authorized designee, Leticia Vandehaar, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102, shall constitute service upon the Commission for purposes of this action.

Respectfully submitted,

BY: _/s/ Christopher R. Kelly_
Scott A. Thompson
Christopher R. Kelly
Paul T. Chryssikos
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
One Penn Center
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

March 9, 2016